ORIGINAL

1  DONALD FALK (SBN 150256)
   dfalk@mayerbrown.com
2  JOHN M. NEUKOM (SBN 275887)
   jneukom@mayerbrown.com
3  MAYER BROWN LLP
   Two Palo Alto Square, Suite 300
4  3000 El Camino Real
   Palo Alto, CA 94306
5  Telephone: (605) 331-2030
   Facsimile: (606) 331-4530
6
   *Attorneys for Plaintiff*
7  *AT&T Mobility LLC*

FILED

AUG 1 2 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8              **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                    CV 11 3992

11

   AT&T MOBILITY LLC,
12
                      Plaintiff,              Case No.
13
        v.                                    **COMPLAINT FOR DECLARATORY**
14                                            **AND INJUNCTIVE RELIEF**
   LESLIE BERNARDI and LAURA BARRETT,
15
                      Defendants.
16

17

18        Plaintiff AT&T Mobility LLC ("ATTM"), by its undersigned attorneys, for its Complaint

19  against defendants Leslie Bernardi and Laura Barrett, alleges as follows:

20                            **NATURE OF THE ACTION**

21        1.      ATTM has filed this action to enforce its right under the governing arbitration

22  agreements, the Federal Arbitration Act, and state contract law to require that its customers

23  pursue their disputes in arbitration in accordance with their arbitration agreements, which place

24  express limitations on the matters that may be arbitrated. Defendants are among the 1,000 (and

25  counting) ATTM customers whom the law firm of Bursor & Fisher P.A. ("Bursor") has solicited

26  and now claims to have recruited as part of a scheme to pressure ATTM into settling meritless

27  claims. Under the "plan" brazenly announced on Bursor's website, defendants and the other

28  claimants intend to "use AT&T's own Arbitration Agreement" against ATTM by filing

                                         1

1  "thousands" of copycat consumer arbitrations seeking identical, class-wide relief: a blanket

2  injunction prohibiting ATTM from completing its $39 billion merger with T-Mobile USA, Inc.

3  ("T-Mobile"). As part of this effort, Bursor has enlisted the law firm of Faruqi & Faruqi, LLP

4  ("Faruqi"), whose lawyers are six of the claimants who have filed Demands for Arbitration thus

5  far. Although the claim is meritless, the Bursor and Faruqi firms are hoping that thousands of

6  "bites at the same apple" will turn up just one arbitrator willing to entertain it—and that ATTM

7  will hedge against that risk by entering into an extortionate settlement.

8       2.     Bursor and Faruqi's scheme plainly violates the arbitration agreement between

9  ATTM and each defendant (attached as Exhibit A). Among other limitations on the scope of

10 arbitration, the agreement expressly precludes "any form of representative or class proceeding"

11 and permits claims for injunctive relief "only in favor of the individual party seeking relief and

12 only to the extent necessary to provide relief warranted by that party's individual claim."

13 Defendants' Demands for class-wide injunctive relief—if granted in even one arbitration

14 notwithstanding the complete absence of factual or legal support and notwithstanding the express

15 limitations in the arbitration agreement—would directly affect more than 120 million wireless

16 customers and millions of other individuals and businesses, as well as federal, state, and local

17 governments which are not represented in these arbitration proceedings. Accordingly, these

18 Demands fall far outside the scope of this provision.

19      3.     Bursor and Faruqi seek this wide-ranging relief in proceedings that would exclude

20 the millions of customers and countless organizations and government entities that would be

21 affected by the class-wide, non-individualized relief that defendants demand—including the

22 hundreds of government officials, organizations, businesses, and individuals who wish to realize

23 the benefits that would result from the merger, including:

24            a.     the more than 120 million ATTM and T-Mobile customers, who would

25 benefit from better service, fewer dropped calls, and faster data downloads, as well as the 55

26 million Americans to whom the combined company will offer a state-of-the-art 4G LTE mobile

27 broadband service that would not be available from either company without the merger;

28

2

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1         b.     the governors of 26 states, state attorneys general in 11 states, and over 75

2   members of the United States Senate and House of Representatives who have expressed their

3   support for the merger to the Federal Communications Commission ("FCC");

4         c.     labor unions representing 20 million workers and educators, including the

5   Communications Workers of America, the AFL-CIO, the Teamsters, the Service Employees

6   International Union, the International Union of Painters and Allied Trades, the United Food and

7   Commercial Workers, the United Mine Workers of America, the National Education

8   Association, and the American Federation of Teachers, who have urged FCC approval of the

9   merger;

10        d.     leading mobile computing technology businesses, including equipment

11  and handset manufacturers (*e.g.*, Qualcomm, Corning, Research in Motion, Pantech, Avaya,

12  Juniper Networks, Brocade, JDS Uniphase, Amdocs, Tellabs, ADTRAN, and Sierra Wireless)

13  providers of applications, content, and technology (*e.g.*, Facebook, Microsoft, Oracle, and

14  Yahoo!), and venture capital firms (*e.g.*, Kleiner Perkins Caufield & Byers, Sequoia Capital,

15  Charles River Ventures, Matrix Partners, New Venture Partners, Technology Crossover

16  Ventures, Radar Partners, Norwest Partners, and Lightspeed Ventures), who have endorsed the

17  merger as a means of addressing rising consumer demand for wireless services and fueling

18  innovation and investment in U.S. high-tech industries;

19        e.     public interest groups representing the interests of minorities (*e.g.*, the

20  NAACP, the Hispanic Institute, and the United States Hispanic Chamber of Commerce), people

21  with disabilities (*e.g.*, Institute on Disability, the American Foundation for the Blind, the

22  American Association of People with Disabilities, and the United Spinal Association), rural

23  citizens (*e.g.*, the National Grange, the U.S. Cattlemen's Association, the National Black

24  Farmers Association, the Intertribal Agriculture Council, and the National Rural Health

25  Association), and supporters of environmental protection (*e.g.*, the Sierra Club and Future 500),

26  who support the merger based on the benefits their respective constituents will realize as a result

27  of the merger, such as the enormous beneficial economic impact for rural America and the U.S.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   economy as a whole that will result from the $8 billion network investment that will be used to
2   integrate the networks and expand 4G LTE service to 97% of Americans; and

3           f.      T-Mobile USA, Inc. and its parent company, Deutsche Telekom AG,
4   which obviously have an interest in the consummation of the merger, and would have their rights
5   determined in arbitration proceedings to which they are not parties, should the Bursor and Faruqi
6   scheme be permitted to continue.

7       4.      Each of the improper individual arbitration proceedings that Bursor and Faruqi
8   seek to initiate is an attempt to displace the rigorous, congressionally mandated inquiries already
9   being conducted by the U.S. Department of Justice ("DOJ") and the FCC into, among other
10  things, the technological and competitive characteristics of wireless service provided by the
11  merging parties in hundreds of individual cellular market areas nationwide and the public
12  benefits resulting from the transaction. In addition, the public utility commissions in five
13  states—Arizona, California, Hawaii, Louisiana, and West Virginia—have reviewed or are
14  currently reviewing the merger, with three of those commissions (Arizona, Louisiana, and West
15  Virginia) already having granted approval.      Teams of government lawyers, economists,
16  engineers, and network specialists have been hard at work analyzing—and will continue
17  analyzing for at least the next several months—numerous disputed issues of antitrust law,
18  econometrics, network infrastructure and design, and wireless technology, presented through
19  hundreds of thousands of pages of briefs, business documents, declarations, and other
20  submissions and from dozens of witnesses. Under Bursor and Faruqi's scheme, each arbitration
21  panel potentially could be faced with the very same issues and evidence that the regulators are
22  evaluating—in addition to the many non-issues that Bursor and Faruqi concoct in the Demands.

23          a.      For example, issues have been raised in regulatory proceedings regarding
24  the relevant product and geographic markets that should frame the merger analysis. Similar
25  issues would likely be raised in the arbitrations.

26          b.      With respect to each market and in general, there will be competing
27  testimony and (at least on ATTM's side) highly sophisticated and complex econometric and
28  engineering models and other evidence demonstrating the merger's enormous efficiencies and

1    cost savings as well as other pro-competitive effects on pricing, quality, network capacity, and
2    innovation. Each proceeding would necessarily involve a detailed assessment of this evidence as
3    it relates to the benefits to consumers and businesses arising from network synergies realized by
4    the merger, including the increased capacity and output resulting from combining the two
5    companies' spectrum and infrastructure; an analysis of the relationship between increases in
6    capacity and output and the resulting effect on marginal costs and prices charged to consumers;
7    and the impact of other synergies. Each proceeding would also likely require analysis of the
8    competitiveness of wireless services before and after the merger in scores of markets around the
9    country.

10            c.      In addition to placing in issue the impact on services to ATTM's retail
11    customers, based on the allegations made in the Demands Bursor and Faruqi likely will attempt
12    to expand the scope of each proceeding to address a host of other issues that have been raised by
13    various merger opponents in the FCC proceeding, including the merger's impact on various
14    "inputs" for the provision of wireless service, such as roaming, wireless backhaul services, and
15    wireless devices, which are provided in a global marketplace. Indeed, the FCC has been
16    evaluating and gathering data on the marketplace for wireless backhaul for years.

17       5.      Given the extraordinarily broad nature of the proceedings that would take place
18    with respect to the defendants' Demands alone, it makes practical sense to determine whether
19    these arbitrations may proceed in the first place.

20       6.      Even more important, the law requires as much. Questions of arbitrability—
21    including whether the Demands are outside the scope of the relevant arbitration agreement—are
22    for courts to decide in the first instance. If this Court does not intercede, ATTM would be
23    deprived of its contractual and statutory right to threshold review by a court of the arbitrability of
24    the claims and the authority of the arbitrator to decide them. In the meantime, ATTM will be
25    forced to incur massive costs and the loss of its rights under the Federal Arbitration Act ("FAA")
26    and its arbitration agreements.

27

28

1    7.    Accordingly, this Court should preliminarily and permanently enjoin defendants
2    from continuing the arbitrations they have initiated against ATTM and issue a declaratory
3    judgment stating that defendants' Demands may not be pursued in arbitration.

**PARTIES**

5    8.    Plaintiff ATTM is a limited-liability company organized and existing under the
6    laws of Delaware, with its headquarters and principal place of business in Georgia. ATTM is an
7    indirect, wholly owned subsidiary of AT&T Inc. ("AT&T"), and has five members:

8        a. SBC Long Distance, LLC, a Delaware limited liability company whose sole
9            member, SBC Telecom, Inc., is a Delaware corporation with its principal place of
10           business in Texas;

11       b. SBC Alloy Holdings, Inc., a Delaware corporation with its principal place of
12           business in Texas;

13       c. AT&T Mobility Corporation, a Delaware corporation with its principal place of
14           business in Georgia;

15       d. New BellSouth Cingular Holdings, Inc., a Delaware corporation with its principal
16           place of business in Georgia; and

17       e. BellSouth Mobile Data, Inc., a Delaware corporation with its principal place of
18           business in Georgia.

19   9.    Upon information and belief, defendants Leslie Bernardi and Laura Barrett are
20   ATTM customers who reside in Bay Point, California

**JURISDICTION AND VENUE**

22   10.   This is an action for declaratory and injunctive relief pursuant to 28 U.S.C.
23   §§ 2201 and 2202, and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*

24   11.   This Court has personal jurisdiction over each of the defendants because, upon
25   information and belief, they are residents of the State of California.

26   12.   This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the
27   underlying dispute involves a federal question under the Clayton Antitrust Act of 1914 (the
28   "Clayton Act"), 15 U.S.C. §§ 18, 26.

6

13. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy, exclusive of costs and interest, exceeds $75,000. In particular, the purchase price of the merger that defendants wrongfully seek to enjoin is approximately $39 billion.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because defendants reside in this judicial district.

15. **Intra-district Assignment.** Pursuant to Civil Local Rules 3-2(c), 3-2(d), and 3-5, this action is suitable for assignment to the San Francisco or Oakland divisions because the events giving rise to this action occurred in Contra Costa County, California.

## FACTUAL BACKGROUND

16. ATTM is a nationwide provider of wireless voice and data services. Its network serves more than 97 million mobile customers across the country and spans every major metropolitan area.

17. On March 20, 2011, AT&T and Deutsche Telekom AG—the parent company of T-Mobile USA, Inc.—announced an agreement under which AT&T will acquire T-Mobile USA for approximately $39 billion.

18. The merger between ATTM and T-Mobile is currently being reviewed by the DOJ, the FCC, certain state Attorneys General, and various other state regulators. The FCC and DOJ began their reviews soon after the merger agreement was announced in March 2011. The ongoing DOJ and FCC proceedings—which are expected to continue for the next several months—have involved and will continue to involve an intensive commitment of resources on the part of the merging parties, two federal regulatory agencies, and numerous supporters and opponents of the merger. As an example, on July 13, 2011 the FCC hosted a workshop of economists to discuss issues presented by the merger. That workshop was attended by 41 FCC and DOJ staff members, 22 representatives of the merging parties, and 21 representatives of Sprint-Nextel, a principal opponent of the merger.

19. In addition, in the FCC proceedings alone, the merging parties have submitted hundreds of pages of briefs and 19 witness affidavits; over 130 parties have registered their

7

1  opposition to the merger; and over 400 parties—including labor unions, businesses, public
2  interest groups, and dozens of state and federal elected officials—have filed in support. Tens of
3  thousands of individuals have also submitted comments on the merger to the FCC. Moreover,
4  the FCC has issued comprehensive requests for information to the merging parties, resulting in
5  the production by ATTM of some 1.4 million pages of information and millions of data points
6  related to wireless service across the country for the last three years. Similar data from
7  competitors of and vendors to the merging parties is being collected and analyzed by the FCC.

8      20.    Moreover, the public utility commissions of Arizona, California, Hawaii,
9  Louisiana, and West Virginia have commenced proceedings to review the effect of the merger on
10  competition in their respective states.  The commissions in Arizona, Louisiana, and West
11  Virginia have already granted approval of the merger.

12          a. The Public Service Commission of West Virginia found that the merger "would
13              not substantially alter the level of competition in the wireless market in West
14              Virginia." *In re AT&T Inc. & T-Mobile USA, Inc. Joint Pet. for Consent &*
15              *Approval in Advance of AT&T's Acquisition of Stock of T-Mobile USA, Inc. or, in*
16              *the Alternative, for a Comm'n Order Exempting the Proposed Transaction from*
17              *the Provisions of W.Va. Code § 24-2-12*, at 5 ¶ 5, Case No. 11-0563-C-PC (W.
18              Va. Pub. Serv. Comm'n July 29, 2011).

19          b. The Arizona Corporation Commission held that approving the merger "is in the
20              public interest," noting the staff's conclusion that the anticipated benefits of the
21              merger "are important to the continued and future quality of telecommunications
22              services to Arizona consumers." *In re the Application of AT&T Commc'ns of the*
23              *Mt. States on Behalf of Itself, Ariz. Operating Subsidiaries and T-Mobile USA,*
24              *Inc. for a Limited Waiver of the Comm'n's Affiliated Interest Rules Pursuant to*
25              *A.A.C. R14-2-806 or, Alternatively, the Notice of Intent Pursuant to A.A.C. R14-*
26              *2-803*, Decision No. 72441, at 6, 9, Dkt. No. T-02428A-11-0170 (Az. Corp.
27              Comm'n June 27, 2011).

28

1

2

3

4

5

6

  c. The Louisiana Public Service Commission approved the merger after the staff determined that the merger, among other things, would result in "increased broadband coverage in Louisiana in rural areas[] and create jobs in Louisiana." Staff's Report and Recommendations, at 14, *In re Joint 301 M. Filing Regarding AT&T Inc.'s Acquisition of the Stock of T-Mobile USA, Inc.*, Dkt. No. S-31946 (La. Pub. Serv. Comm'n July 19, 2011).

7

8

9

10

11

12

13

14

15

21. Despite these monumental, inclusive, and transparent federal and state regulatory proceedings, in July 2011 the Bursor law firm announced "a plan to use AT&T's own Arbitration Agreement to help stop the takeover of T-Mobile." Bursor declared that it was prepared to institute "thousands" of coordinated copycat arbitrations under the consumer-arbitration provision in ATTM's standard wireless agreement and that each arbitration would seek the same relief: "enjoin[ing] the merger." To that end, Bursor launched a web site (http://www.fightthemerger.com) designed to solicit ATTM customers to "join that effort" by filling in a form on the site. In return, Bursor promised that the customers could "seek a $10,000 award" in the arbitrations that take place.

16

17

18

19

20

21

22

23

24

25

26

27

22. According to one press report, Bursor's stated goal is to coerce "AT&T to settle, given the 'daunting' prospect of fighting more than 750 arbitrations, any one of which could stop the deal." Terry Baynes, Reuters, Law Firm Strikes Back At AT&T Over Merger (July 27, 2011). Another press report quotes one of Bursor's co-counsel in these arbitrations, Barry Davis of Thornton, Davis & Fein, as saying that "we will soon have more than one thousand arbitrations on file, any one of which could stop this merger." Josh Long, AT&T Customers Challenge T-Mobile Merger Via Arbitration (Aug. 9, 2011), at http://www.channel partnersonline.com/news/2011/08/att-customers-challenge-t-mobile-merger-via-arbitration.aspx. Another reporter quotes Scott Bursor of the Bursor firm as saying: "If we bring 100 cases and lose 99 of them we are going to win." Ina Fried, All Things D, AT&T Customers File Arbitration Cases Seeking to Block T-Mobile Merger (July 22, 2011), at http://allthingsd. com/20110722/att-customers-file-arbitration-cases-seeking-to-block-t-mobile-merger.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

23. Indeed, in an effort to recruit still more claimants, Bursor has issued a press release that misleadingly implies that every customer who files an arbitration demand will receive a $10,000 windfall, so long as any one of them succeeds in persuading an arbitrator to block the merger. *See* PR Newswire Association LLC, Bursor & Fisher Law Firm Announces more than 1,000 AT&T Customers to File Arbitration Cases Challenging AT&T's Takeover of T-Mobile (Aug. 9, 2011).

24. Bursor has brought numerous consumer class actions against ATTM and other telecommunications companies. Based on information and belief, lawyers at Bursor derive a substantial portion of their income from attorneys' fees awarded as part of class-action settlements. For example, class actions that they have obtained attorneys' fees for settling include *Nguyen v. T-Mobile USA, Inc.*, No. JCCP 4332 (Cal. Super. Ct. Alameda Cty.), and *White v. Cellco Partnership d/b/a Verizon Wireless*, No. RG04 137699 (Cal. Super. Ct. Alameda Cty.).

25. The U.S. Supreme Court's recent decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011)—which confirmed that ATTM's arbitration agreement is enforceable—precludes Bursor from maintaining class actions against ATTM in the name of its customers. The decision thus represents a clear threat to Bursor's business model of extracting lucrative attorneys' fee awards from businesses targeted by class actions. Indeed, Bursor currently is fighting tooth and nail to resist ATTM's motion to compel arbitration in a pending class action in which Bursor claims to have made a substantial financial investment. *See Hendricks v. AT&T Mobility LLC*, No. 11-cv-409-EMC (N.D. Cal.).

26. Scott Bursor told a reporter that, in reaction to the Supreme Court's decision in *Concepcion*, which was issued on April 27, 2011, he decided "to put that [ATTM arbitration process] to the test." Terry Baynes, Reuters, Law Firm Strikes Back At AT&T Over Merger (July 27, 2011).

27. Bursor—along with Faruqi and Thornton, Davis & Fein—has already commenced 26 arbitrations before the AAA. To do so, they have enlisted a familiar cast of characters as the figurehead plaintiffs. In fact, 13 of the 26 claimants who have already filed demands are either

1  Faruqi attorneys or individuals who have served in the past as named plaintiffs in class actions
2  brought by Bursor or Faruqi.

3       28.    Specifically, of the claimants who have filed essentially identical demands, Chris
4  Marlborough, Juan Monteverde, Richard Gonnello, Beth Keller, Sandra Smith, and Emily
5  Komlossy are Faruqi attorneys. And defendant Leslie Bernardi, along with Richard Colosimo,
6  Jared Pope, Leaf O'Neal, Alexis Ubiera, Alexis Justak, and Astrid Mendoza, are plaintiffs who
7  have been represented by Bursor or Faruqi in prior class or collective actions.

8       29.    Bursor and Faruqi represented Richard Colosimo, a former Faruqi attorney, in a
9  2010 consumer class action against ATTM. *See Colosimo v. AT&T*, No. 2:10-cv-01495 (D.N.J.
10  filed March 24, 2010). Faruqi also represented Leaf O'Neal and Jared Pope in a Fair Labor
11  Standards Act collective action against the health club, Club Fit. *See Bazzini et al. v. Club Fit
12  Mgmt., Inc.*, No. 1:08-cv-04530 (S.D.N.Y. 2008). Currently, Faruqi represents O'Neal and
13  Alexis Ubiera in a separate FLSA action against three sports club operators for unpaid wages.
14  *See O'Neal et al. v. Frem Group, L.P. et al*, No. 2011-cv-02633 (S.D.N.Y. filed April 18, 2011).
15  Further, Alexis Justak is a named plaintiff in a consumer class action handled by Bursor and
16  Faruqi against the food producer, ConAgra Foods. *See Scarpelli v. ConAgra Foods, Inc.*, No.
17  2:11-cv-04038 (D.N.J. filed July 14, 2011). Leslie Bernardi, represented by Faruqi, and Astrid
18  Mendoza, represented by Bursor, were class representatives in two class actions against ATTM
19  and Cingular Wireless. *See Meoli, et al. v. AT&T Wireless PCS, LLC, et al.*, No. RG 03086113
20  (Cal. Super. Ct. 2008); *Mendoza, et al. v. Cingular Wireless LLC, et al.*, No. RG 03114152 (Cal.
21  Super. Ct. 2008).

22       30.    In commencing these arbitrations, the intent of Bursor and Faruqi is patently
23  evident: to institute against ATTM representative actions seeking class-wide relief wrapped in
24  the guise of individual arbitration proceedings.

25       31.    In fact, ATTM's arbitration provision (attached as Exhibit A) does not permit
26  customers to pursue the representative claims for class-wide relief that Bursor and Faruqi have
27  instituted on the defendants' behalf. Among other limitations on the scope of arbitration, the
28  agreement expressly precludes "any form of representative or class proceeding" and permits

11

1  claims for injunctive relief "only in favor of the individual party seeking relief and only to the
2  extent necessary to provide relief warranted by that party's individual claim."

3      32.     Despite these restrictions, Bursor and Faruqi have sent ATTM more than 900
4  nearly identical Notices of Dispute—each on behalf of a different customer the firm purports to
5  represent—demanding that ATTM terminate its merger agreement with T-Mobile within 30
6  days. Submitting a Notice of Dispute is the first step in the dispute-resolution process under
7  ATTM's arbitration provision. If a dispute is not resolved within 30 days from the filing of the
8  notice, a customer may commence arbitration by filing a Demand for Arbitration with the
9  American Arbitration Association ("AAA").

10     33.     The 26 Demands for Arbitration that Bursor and Faruqi have filed with the AAA
11 are nearly identical in substance and copied largely verbatim from comments and petitions filed
12 with the FCC in opposition to the merger, in particular from the papers filed by Sprint, a lead
13 opponent of the merger. Indeed, even though Bursor and Faruqi seek to preempt government
14 review of the merger, portions of the demands urge the DOJ and FCC to pursue an intensive
15 investigation into the proposed merger. Moreover, each Demand seeks the same indivisible,
16 class-wide, collective relief: an order enjoining the merger between ATTM and T-Mobile under
17 the Clayton Act, 15 U.S.C. § 26 and, failing that, an injunction imposing a number of
18 burdensome restrictions on the terms of the merger. Defendants are among those on whose
19 behalf Bursor and Faruqi have filed Demands for Arbitration.

20     34.     Although styled as a request for arbitration on an individual basis, each Demand
21 is actually a representative action. As the basis for defendants' Clayton Act claims, each
22 Demand asserts that the merger would cause a variety of "public interest harms" with no benefit
23 to "the public at large," "including a loss of American jobs," "reduced investment in America,"
24 "serious adverse implications for the U.S. economy as a whole," "stifle[d]" innovation, a "waste"
25 of the wireless spectrum, and harm to competition, independent wireless retailers, and wireless
26 "consumers" alike. It even complains that the merger will not benefit "T-Mobile subscribers."

27     35.     Moreover, as the purported remedy for these public concerns, each Demand
28 asserts a representative claim seeking class-wide relief in the form of an injunction flatly

1   prohibiting the merger or, alternatively, imposing global restrictions on the merger. Such a
2   remedy would impact each of the more than 120 million customers of ATTM and T-Mobile as
3   well as the wireless industry, the American economy, organized labor, America's high-tech
4   industry, rural and smaller communities around the country (which will as a result of the merger
5   get access to 4G LTE service), and thousands of other companies and organizations that will
6   benefit from the merger. If these multiple improper arbitrations were permitted to proceed,
7   notwithstanding the compelling reasons why they should not proceed, members of this huge
8   class who support the merger would have their rights determined adversely by the injunctive
9   relief sought by defendants. Indeed, among the many representative aspects of this class-wide
10   injunctive relief, the Demands request restrictions on AT&T's wireline DSL broadband
11   service—which has nothing to do with defendants' wireless service—as well as an order
12   divesting portions of ATTM's wireless spectrum holdings to competitors so that "the public
13   interest would be best served."

14       36.   Defendants do not assert any individual claims, and they do not seek any relief—
15   injunctive or otherwise—that would affect only the particular defendant initiating the arbitration.
16   For example, defendants do not seek damages for any of the alleged injuries that they say the
17   merger would cause. Nor do they seek individual injunctions that (if their claims were proven on
18   the merits) would be permitted by the arbitration provision, such as ones requiring ATTM to
19   preserve their own individual rate plans for some time period following the merger. Were they
20   to present such individualized claims for relief, they—and every one of the other individuals
21   whom Bursor and Faruqi purport to represent—would be able to resolve those claims under the
22   arbitration agreement.

23       37.   Instead, the relief sought by each defendant bears all of the characteristics of a
24   representative action: it would affect a broad class—millions of individuals, businesses, and
25   organizations of every type—and even if just one of the defendants or other similarly-situated
26   individuals prevails, the interests of the entire class would be affected.

27       38.   Accordingly, the defendants' Demands are outside of the scope of arbitration
28   available under defendants' arbitration agreements. Moreover, defendants cannot pursue their

1  claims because they seek to resolve collective disputes in proceedings that would exclude the
2  millions of customers and countless organizations and government entities that would be affected
3  by the non-individualized relief that defendants demand. Because questions of arbitrability are
4  for the court and not the arbitrator to decide, this Court should enjoin defendants from continuing
5  their arbitrations and issue a declaratory judgment stating that defendants' Demands are outside
6  the scope of their arbitration agreements and that defendants are therefore precluded from
7  pursuing them in arbitration.

8                              **CLAIMS FOR RELIEF**

9                          **Count I: Federal Arbitration Act**

10       39.     Plaintiff ATTM repeats and realleges the allegations in paragraphs 1 through 38
11  above as though fully set forth herein.

12       40.     Questions of arbitrability—including whether asserted claims are outside the
13  scope of the governing arbitration agreement—are for a court, not the arbitrator, to decide in the
14  first instance. Indeed, the arbitration agreement between ATTM and each defendant specifies
15  that "issues relating to the scope and enforceability of the arbitration provision are for the court
16  to decide."

17       41.     Each defendant has filed a Demand for Arbitration that asserts representative
18  claims and seeks class-wide relief outside the scope of his or her arbitration agreement with
19  ATTM.

20       42.     The arbitration agreement between ATTM and each defendant is a valid and
21  binding contract supported by consideration on both sides. In exchange for ATTM's promise to
22  provide wireless service in accordance with the terms of the agreement, each defendant promised
23  to pay for that service on a monthly basis and to adhere to the terms of the agreement.

24       43.     The agreement provides that "[t]he arbitrator may award injunctive relief only in
25  favor of the individual party seeking relief and only to the extent necessary to provide relief
26  warranted by that party's individual claim. YOU AND AT&T AGREE THAT EACH MAY
27  BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL
28  CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED

                                        14

1 CLASS OR REPRESENTATIVE PROCEEDING. Further, unless both you and AT&T agree
2 otherwise, the arbitrator may not consolidate more than one person's claims, and may not
3 otherwise preside over any form of a representative or class proceeding."

4     44.    In direct violation of these terms, defendants have filed representative claims
5 seeking class-wide injunctive relief, which the AAA has docketed and started administering.

6     45.    The Federal Arbitration Act, 9 U.S.C. §§ 1-16, authorizes an injunction to prevent
7 the arbitrations from proceeding. Under Section 4 of the FAA, "[a] party aggrieved by the
8 alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration
9 may petition" a federal district court "for an order directing that such arbitration proceed in the
10 manner provided for in such agreement." 9 U.S.C. § 4. "The power to enjoin an arbitration is
11 the concomitant of the power to compel arbitration and thus the same provision of the FAA, 9
12 U.S.C. § 4, authorizes both types of orders." *PCS 2000 LP v. Romulus Telecomm., Inc.*, 148
13 F.3d 32, 35 (1st Cir. 1998) (internal quotation marks and citation omitted).

14     46.    The AAA has stated that "in the absence of an agreement by the parties or a court
15 order staying this matter, the AAA will proceed with the administration of this matter" and has
16 communicated with the parties for purposes of beginning the process of appointing arbitrators in
17 response to each Demand. Unless enjoined, defendants will continue to pursue their claims.

18     47.    ATTM is suffering, and will continue to suffer, substantial irreparable harm as a
19 result of this breach by being forced to arbitrate Demands that are beyond the scope of its
20 arbitration agreement.

21     48.    ATTM is entitled to an injunction that precludes defendants from further pursuing
22 their Demands for arbitration.

23     49.    Unless defendants are enjoined, ATTM will suffer irreparable harm in that ATTM
24 will be obliged to defend itself in each arbitration proceeding or risk an adverse ruling in its
25 absence. Participating in those *ultra vires* proceedings would deprive ATTM of its right to
26 arbitrate only those matters that it agreed to arbitrate. That deprivation constitutes irreparable
27 harm as a matter of law. Permitting the arbitrations to proceed would also irreparably subject
28 ATTM to burden and expense on an unprecedented scale, as defendants would force ATTM to

1  arbitrate potentially hundreds—if not more—repeated, parallel proceedings before ATTM could
2  present to a court the question of the arbitrability of their claims, and the very authority of the
3  arbitrator to hear those claims.

4      50.    The irreparable injury to ATTM would be particularly severe in light of the
5  complexity of the defendants' claims, which are aimed at enjoining or placing conditions upon a
6  $39 billion merger.  First, defendants seek to replicate in each arbitration the detailed
7  assessments of the AT&T Mobility/T-Mobile merger now being conducted by the FCC, DOJ,
8  and the public utility commissions of California and Hawaii.  Second, defendants seek to
9  preempt those detailed assessments by having arbitrators issue an injunction barring ATTM and
10  T-Mobile, USA from consummating the merger.  Third, defendants seek to override the
11  decisions of the three states—Arizona, Louisiana, and West Virginia—that already have granted
12  approval to the merger. As described above, ATTM has been participating in extensive reviews
13  of the merger by the DOJ, FCC, and state authorities. ATTM alone has submitted more than 1.4
14  million pages of material and nineteen substantial affidavits to the FCC. Tens of thousands of
15  other interested parties have made submissions—both in support of and opposing the merger.
16  And as each defendant's arbitration demand makes clear, ATTM would be forced to arbitrate
17  extremely complicated issues including the identity of the relevant markets, the potential effect
18  of the merger on competition and prices, the extent of network and other synergies arising from
19  the merger, and the possible enhancements of technological innovation—all on a class-wide
20  scale and in as many as 1,000 or more identical impermissible proceedings.

21      51.    Defendants will suffer no harm from the injunctive relief ATTM seeks, much less
22  irreparable harm. Under ATTM's arbitration provision, each defendant remains fully entitled to
23  pursue an individual claim for any damages that he or she sustains or for narrowly tailored,
24  individualized injunctive relief affecting only the defendant and not third parties—*i.e.*, an
25  injunction "only in favor of the individual party seeking relief and only to the extent necessary to
26  provide relief warranted by that party's individual claim." Moreover, defendants may request
27  that the FCC or DOJ take action—just as the tens of thousands of consumers and businesses that
28  have filed comments with the FCC have done. And the enforcement of the terms of the

1 defendants' arbitration agreements will cause them no harm, as defendants have no right to

2 arbitrate claims that are beyond the scope of their arbitration agreements.

3   52.    In light of the irreparable harm that defendants' unauthorized arbitral proceedings

4 will inflict on ATTM, and the lack of harm to defendants, the balance of equities tips decidedly

5 in favor of awarding injunctive relief to ATTM.

6   53.    The public interest would also be served by the injunctive relief ATTM requests.

7 The proposed merger between ATTM and T-Mobile will benefit the millions of customers who

8 subscribe to wireless service from both companies and the marketplace for wireless services as a

9 whole. By wrongfully asking arbitrators to enjoin the merger, defendants seek to short-circuit

10 the congressionally mandated regulatory review process of the DOJ and the FCC, as well as the

11 review process of five state public utility commissions. Indeed, the arbitrations effectively seek

12 to set aside the determinations of three state public utility commissions—made after public

13 hearings and careful deliberations—to approve the merger. This thorough government review

14 process, led by the DOJ and the FCC, is designed to address and determine whether the merger

15 will advance or adversely impact competition and whether the merger is in the public interest.

16 Defendants' attempt to prevent the merger from being consummated through proceedings that

17 are closed to the thousands of interested consumers, businesses, organizations, and states that are

18 participating in the federal and state regulatory proceedings would circumvent this carefully

19 calibrated regulatory review process and thereby greatly injure the public interest.

20   54.    ATTM also is entitled to a declaratory judgment stating that defendants' Demands

21 are outside the scope of permissible arbitration under their arbitration agreements and that

22 defendants are therefore precluded from pursuing the Demands in arbitration.

23                          **Count II: Breach of Contract**

24   55.    Plaintiff ATTM repeats and realleges the allegations in paragraphs 1 through 54

25 above as though fully set forth herein.

26   56.    As discussed above, the arbitration provision contained in defendants' contracts

27 with ATTM precludes defendants from pursuing their arbitration Demands.

28

1    57.    Defendants' filing of their arbitration Demands and pursuit of the ensuing

2  arbitrations constitutes a material breach of defendants' contracts with ATTM.

3    **WHEREFORE**, Plaintiff requests the following relief:

4    A.    Judgment in ATTM's favor and against defendants declaring that their Demands

5  are outside the scope of their arbitration agreements and therefore that defendants' arbitrations

6  may not proceed;

7    B.    A preliminary and a permanent injunction against defendants that prohibits them

8  from pursuing in arbitration their Demands or any other representative claims for collective

9  relief;

10    C.    Specific performance of each defendant's arbitration agreement;

11    D.    Reasonable attorneys' fees and all costs associated with this action; and

12    E.    Such other relief as may be just and proper.

13

14  Dated: August 12, 2011                    By: _____
                                                DONALD M. FALK (Bar No. 150256)
15                                              dfalk@mayerbrown.com
                                                JOHN M. NEUKOM (Bar No. 275887)
16                                              jneukom@mayerbrown.com
                                                MAYER BROWN LLP
17                                              Two Palo Alto Square, Suite 300
                                                3000 El Camino Real
18                                              Palo Alto, CA 94306
                                                (605) 331-2030 (phone)
19                                              (606) 331-4530 (fax)

20
    *Of counsel*
21  Andrew J. Pincus
    Evan M. Tager
22  Archis A. Parasharami
    Kevin Ranlett
23  MAYER BROWN LLP
    1999 K Street, N.W.
24  Washington, DC 20006
    Telephone: (202) 263-3217
25  Facsimile: (202) 263-5217

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# EXHIBIT A

> Wireless Customer Agreement > 2.0 HOW DO I RESOLVE DISPUTES WITH AT&T?  Print this page

## 2.0 HOW DO I RESOLVE DISPUTES WITH AT&T?

- 2.1 Dispute Resolution By Binding Arbitration
- 2.1 Arbitration Agreement

### 2.1 Dispute Resolution By Binding Arbitration

Print this section | Print this page

**PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.**

Summary:
Most customer concerns can be resolved quickly and to the customer's satisfaction by calling our customer service department at 1-800-331-0500. **In the unlikely event that AT&T's customer service department is unable to resolve a complaint you may have to your satisfaction (or if AT&T has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction.** Arbitration is more informal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts. Arbitrators can award the same damages and relief that a court can award. **Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted.** For any non-frivolous claim that does not exceed $75,000, AT&T will pay all costs of the arbitration. Moreover, in arbitration you are entitled to recover attorneys' fees from AT&T to at least the same extent as you would be in court.

In addition, under certain circumstances (as explained below), AT&T will pay you more than the amount of the arbitrator's award and will pay your attorney (if any) twice his or her reasonable attorneys' fees if the arbitrator awards you an amount that is greater than what AT&T has offered you to settle the dispute.

See related links | See all legal

### 2.2 Arbitration Agreement

Print this section | Print this page

(1) AT&T and you agree to arbitrate **all disputes and claims** between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;
- claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);
- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
- claims that may arise after the termination of this Agreement.

References to "AT&T," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us. Notwithstanding the foregoing, either party may bring an individual action in small claims court. This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, including, for example, the Federal Communications Commission. Such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into this Agreement, you and AT&T are **each waiving the right to a trial by jury or to participate in a class action.** This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement.

2) A party who intends to seek arbitration must first send to the other, by certified mail, a written Notice of Dispute ("Notice"). The Notice to AT&T should be addressed to: Office for Dispute Resolution, AT&T, 1025 Lenox Park Blvd., Atlanta, GA 30319 ("Notice Address"). The Notice must (a) describe the nature and basis of the claim or dispute; and (b) set forth the specific relief sought ("Demand"). If AT&T and you do not reach an agreement to resolve the claim within 30 days after the Notice is received, you or AT&T may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by AT&T or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or AT&T is entitled. You may download or copy a form Notice and a form to initiate arbitration at att.com/arbitration-forms.

(3) After AT&T receives notice at the Notice Address that you have commenced arbitration, it will promptly reimburse you for your payment of the filing fee, unless your claim is for greater than $75,000. (The filing fee currently is $125 for claims under $10,000 but is subject to change by the arbitration provider. If you are unable to pay this fee, AT&T will pay it directly upon receiving a written request at the Notice Address.) The arbitration will be governed by the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. The AAA

Rules are available online at adr.org, by calling the AAA at 1-800-778-7879, or by writing to the Notice Address. (You may obtain information that is designed for non-lawyers about the arbitration process at att.com/arbitration-information.) The arbitrator is bound by the terms of this Agreement. All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision are for the court to decide. Unless AT&T and you agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as otherwise provided for herein, AT&T will pay all AAA filing, administration, and arbitrator fees for any arbitration initiated in accordance with the notice requirements above. If, however, the arbitrator finds that either the substance of your claim or the relief sought in the Demand is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse AT&T for all monies previously disbursed by it that are otherwise your obligation to pay under the AAA Rules. In addition, if you initiate an arbitration in which you seek more than $75,000 in damages, the payment of these fees will be governed by the AAA rules.

4) If, after finding in your favor in any respect on the merits of your claim, the arbitrator issues you an award that is greater than the value of AT&T's last written settlement offer made before an arbitrator was selected, then AT&T will:

- pay you the amount of the award or $10,000 ("the alternative payment"), whichever is greater; and
- pay your attorney, if any, twice the amount of attorneys' fees, and reimburse any expenses (including expert witness fees and costs) that your attorney reasonably accrues for investigating, preparing, and pursuing your claim in arbitration ("the attorney premium").

If AT&T did not make a written offer to settle the dispute before an arbitrator was selected, you and your attorney will be entitled to receive the alternative payment and the attorney premium, respectively, if the arbitrator awards you any relief on the merits. The arbitrator may make rulings and resolve disputes as to the payment and reimbursement of fees, expenses, and the alternative payment and the attorney premium at any time during the proceeding and upon request from either party made within 14 days of the arbitrator's ruling on the merits.

(5) The right to attorneys' fees and expenses discussed in paragraph (4) supplements any right to attorneys' fees and expenses you may have under applicable law. Thus, if you would be entitled to a larger amount under the applicable law, this provision does not preclude the arbitrator from awarding you that amount. However, you may not recover duplicative awards of attorneys' fees or costs. Although under some laws AT&T may have a right to an award of attorneys' fees and expenses if it prevails in an arbitration, AT&T agrees that it will not seek such an award.

(6) The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. **YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.** Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. If this specific provision is found to be unenforceable, then the entirety of this arbitration provision shall be null and void.

(7) Notwithstanding any provision in this Agreement to the contrary, we agree that if AT&T makes any future change to this arbitration provision (other than a change to the Notice Address) during your Service Commitment, you may reject any such change by sending us written notice within 30 days of the change to the Arbitration Notice Address provided above. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

See related links |    See all legal